DEPARTMENT OF
TRANSPORTATION, Petitioner

v.

PENNSYLVANIA INDUSTRIES FOR
the BLIND AND HANDICAPPED,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 15, 2005.
Decided Oct. 26, 2005.

Audrey R. Miner, Asst. Counsel, Harrisburg, for petitioner.

Bradley A. Schutjer, Harrisburg, for respondent.

BEFORE: SMITH–RIBNER, Judge, and PELLEGRINI, Judge (P.), and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

The Pennsylvania Department of Transportation (Department) petitions for review of an adjudication of the Board of Claims (Board) finding the Department in breach of its contract with the Pennsylvania Industries for the Blind and Handicapped (PIBH). By this contract, PIBH agreed to operate the Department's photo licensing centers under a "cost-plus" system of compensation. The Board held that the Department was obligated to reimburse PIBH for bonus and severance payments made to employees because they were valid "costs" within the meaning of the contract.

## BACKGROUND

The facts are not in dispute. Since 1984, PIBH has operated the Department's photo licensing centers under a series of contracts whereby the Department has compensated PIBH on a per license basis. Effective December 31, 1996, the parties departed from their prior practice to adopt a "cost plus system" of compensation. Under this new system, the Department agreed to reimburse PIBH for its costs for operating the centers, with the proviso that reimbursement would not exceed $10,806,058 in any one year and that aggregate maximum reimbursement for the five-year term of the contract would not exceed $55 million.

The contractual relationship between the Department and PIBH was set forth in several writings. Agreement No. 72099, "Photographic Driver's License/Identification Card Service and Location Agreement," is the basic contract document. It incorporates two other essential documents. "Exhibit A," "Photo License Service Specifications," contains the details of PIBH's performance on matters that range from facility layout (1.3.1), furnishings (1.6.1) and employee job description (3.3) and training (4.2) to metal reflective signs (6.1) and type of electrical outlets (1.4.1). "Exhibit B," "Contract Specification Budget Proposal," is a four-page document prepared by PIBH that identifies fourteen categories of expenses and PIBH's projected costs for each category. In terms of dollar amounts, rent and labor costs are the largest expense categories in the Budget. "Direct Labor," *i.e.*, labor provided by the photo license technicians, is projected to cost $4,213,684 each year, and "Indirect labor," *i.e.*, labor provided by the program managers, is projected to cost $831,673. "Occupancy" is expected to cost $4,247,010 each year. In addition to estimating an annual amount for each of the fourteen expense categories, the Budget specifies a "burden" consisting of 15% to be added to each expense category to cover PIBH's overhead costs for such items as personnel administration and central computer maintenance.[1]

PIBH compensates its employees in salary and benefits, including vacation time, pension, health insurance, life and disability insurance. Reproduced Record at 178a (R.R. ——). In addition, PIBH pays employees who retire, or resign, their accrued but not used vacation time. Finally, PIBH pays employees performance bonuses if certain targets are met. These compensation practices antedate the inception of the relationship instituted by Agreement No. 720999, the Specifications and the Budget (collectively Agreement).

On August 21, 1998, PIBH submitted Invoice No. 10011872 to the Department that requested reimbursement for costs incurred in July 1998, including, *inter alia*, $77,294.61 for the category "indirect labor." Of that amount invoiced, the Department approved $72,726.65. The Department's discrepancy report noted a deduction of $4,567.96 for severance pay, which it refused to pay as outside the terms of the Agreement.

On December 16, 1998, PIBH submitted Invoice No. 10014358 requesting reimbursement for costs incurred in November 1998. Of the $69,027.01 invoiced for "direct labor," the Department approved $56,596.58. The Department's discrepancy report explained the reason for the reduction as "no provision . . . in the contract for employee-bonus payments." Reproduced Record at 29a. R.R. 29a.

In January 1999, PIBH initiated an attempt to resolve the matter, but when it was unsuccessful, PIBH filed a complaint with the Board. The complaint specified that the Department was in breach of contract with respect to four invoices submitted between July 1998 and February 1999,

including Invoice Nos. 10011872 and 10014358, described above. Additionally, the complaint alleged that as "of the date of this Claim, [Department] has continued to refuse to pay PIBH's invoices and it is believed and therefore averred that [Department] will continue to refuse to pay such invoices as well as the invoice[s] set forth in the preceding paragraph." Complaint, ¶ 11; R.R. 7a. As anticipated, the Department continued to refuse to reimburse PIBH for the disputed labor costs for the next four years while the matter was litigated before the Board.

The record before the Board was developed by a joint stipulation of facts, agreed-upon exhibits and the deposition testimony of Joy Gross, the Department's former manager of the Driver License Division of the Bureau of Driver Licensing. Ms. Gross's deposition was placed into the record to explain the Department's position with respect to its obligation to reimburse PIBH for labor costs.

With respect to such labor costs, Ms. Gross delved into the specific matter of bonus and severance payments. She testified that:

A: We believe that the contract does not cover severance pay as severance pay, and, therefore we would not be required to pay for severance. And as far as bonuses are concerned, there are no allowances for bonuses, and so we do not believe that we would be liable to pay for bonuses.

Q: And we've looked at three documents, all of which sort of make up the majority of the contract between the parties. Am I correct that there's no provision that direct-

---

1. PIBH was also required to abide by the standard Commonwealth contractor integrity, non-discrimination and contractor responsi-

bility rules that were attached to Agreement No. 720999 as Exhibits "C," "D" and "E."

ly defines what is reimbursable salary and benefits.

A: That's correct.

Q: *So to put it simplest, [the Department's] position is since it's not in there, we don't have to pay it?*

A: Yes.

R.R. 176a (emphasis added). However, when confronted with the fact that the Department had reimbursed PIBH for other expenses that were "not in there," such as pension and health insurance payments, Ms. Gross opined:

A: Bonuses are above and beyond salary expectations in my view. Bonuses are not something that you expect to get routinely. *These [reimbursed] expenditures, I believe, are things you would expect to get routinely* if that's in your contract, you individually. Bonuses are above and beyond this.

Q: So [the Department's] position on what is reimbursable relates to what an employee would expect as a normal part of their salary and benefits?

A: I believe so, yes.

Q: But that expectation was not written out in any fashion, was it?

A: Specifically, no.

R.R. 178a (emphasis added).

In its pre-trial statement, PIBH explained that it sought damages equal to all bonus and severance payments that the Department had rejected over the life of the contract. The Department objected, asserting that each invoice rejection gave rise to a new cause of action, requiring a separate complaint to be filed. In response, PIBH filed a petition to amend complaint to conform the pleading to the evidence of damages; the Board granted PIBH's petition.

Upon consideration of the evidence, the Board concluded that PIBH's expenses for bonuses and severance pay were reimbursable under the Agreement. It reasoned that the Agreement used very general terms, *i.e.,* "direct labor" and "indirect labor," without any limit on or exclusion for "bonus" and "severance" payments.[2] Further, because it was PIBH's policy to pay performance bonuses and severance for unused vacation time, the Board noted that such payments were appropriate even under the Department's argument that "direct and indirect labor" meant "routine" compensation. Permitting PIBH to amend its complaint, the Board held, did not violate the statute of limitations because the original complaint, which was timely filed, alleged a continuing harm. It rejected the notion that each invoice constituted a separate cause of action and required the filing of a new complaint.

Accordingly, the Board ordered the Department to pay PIBH $319,016.34, plus interest, for unpaid amounts on invoices submitted from August 21, 1998, to June 8, 2002. In addition, the Board ordered the payment of pre-judgment interest in the amount of $81,458.59. The Department then petitioned for this Court's review.

■ On appeal,[3] Department presents two issues for our consideration. First, it

---

**2.** The Board used the terms "direct salary" and "indirect salary" but the actual terms contained in PIBH's Budget are "indirect *labor*" and "direct *labor*." R.R. 69a. (emphasis added).

**3.** This court's scope of review of a decision of the Board is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the necessary findings of fact are supported by substantial evidence. *Tri–State Asphalt Corp. v. Department of Transportation,* 875 A.2d 1199, 1201 (Pa.Cmwlth.2005).

contends that the Board erred in its construction of the term "actual work completed" as used in the Agreement. Second, it contends that the Board erred in granting PIBH's petition to amend its complaint to include additional unpaid invoices.

## CONTRACT TERMS ON BONUS AND SEVERANCE

■ The Department contends that PIBH's payments for bonus and unused vacation time were not "for actual work completed" but, rather, were payments "in addition" to compensation received for the work completed, and, therefore, not reimbursable. In response, PIBH argues that in the absence of specific language on what items make up "labor costs," payments for unused vacation time and for performance bonuses constitute payments for "actual work completed."

Contract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 144, 302 A.2d 347, 351 (1973). Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. *Steuart v. McChesney*, 498 Pa. 45, 51, 444 A.2d 659, 662. " 'When a writing is clear and unequivocal, its meaning must be determined by its contents alone.' " *Murphy v. Duquesne University Of The Holy Ghost*, 565 Pa. 571, 591, 777 A.2d 418, 429 (2001) (quoting *East Crossroads Center Inc. v. Mellon–Stuart Co.*, 416 Pa. 229, 231, 205 A.2d 865, 866 (1965)).

With these principles in mind, we turn to the operative terms of the Agreement. The basic document, Agreement No. 720999, recites the fundamental terms of the contractual agreement:

1. PIBH agrees to provide ... operations of all locations as shown in the specifications provided by the COMMONWEALTH, and in accordance with all of the conditions set forth in the specifications which are attached as Exhibit "A" and made part of this Agreement ...

\* \* \*

4. The COMMONWEALTH will pay PIBH during the existence of this Agreement, *the actual costs for work completed* in accordance with the terms and conditions of the Agreement at the rates set forth in the budget proposal accepted by the COMMONWEALTH and attached as Exhibit "B."

5. PIBH will submit monthly to the COMMONWEALTH a certified detailed statement of *actual expenditures, including but not limited to allowable overhead and indirect charges.* ... failure to submit invoices in a timely manner may result in nonpayment by the COMMONWEALTH. ...

Agreement No. 720999 (emphasis added); R.R. 11a–12a. Exhibit "B," the Budget provides, relevant part, as follows:

A. Direct Labor $4,213,684

There are approximately 350 Photo License Technicians employed through PIBH and its member agencies. These technicians issue the State's 2,200,000 Driver Licenses at 93 locations across the Commonwealth. They are supervised by PIBH's Regional and District Managers.

B/[sic] Indirect Labor $ 831,673

PIBH manages the 93 Driver License Centers with a total staff of 18[:] a State Manager, a Facilities Manager, three Regional Managers, 9 District Managers, a Personnel Coordinator, an Invoice

Administrator, and two Communications/Clerk personnel.

\* \* \*

O. Burden

Burden of 15% is included in each category. This rate is consistent with that currently approved by the Department.... Burden includes normal operating costs: loan/financing expenses, personnel administration, payroll, central computer operations, clerical support, accounts payable and receivable, insurance, professional services, rent, phones, electric, heat, water, sewage, trash removal, maintenance, taxes and other occupancy costs.

Agreement, Exhibit "B," Budget Proposal at ¶¶ A, B and O; R.R. 69a, 72a. Thus, under the Agreement, PIBH agreed to submit detailed monthly statements of "actual expenditures *including but not limited to allowable overhead and indirect charges,*" and Department agreed to pay PIBH for the "actual costs for work com-

pleted." [4] The controversy focuses on "actual costs for work completed." [5]

The Department first argues that the term "actual costs for work completed" is synonymous with "compensation." This is important, according to the Department, because case law has established that a bonus is not compensation. In support, it directs our attention to *Beardsley v. State Employees' Retirement Board,* 691 A.2d 1016 (Pa.Cmwlth.1997).[6] *Beardsley* is a statutory construction, not a contract case. Notwithstanding this difference, the *Beardsley* test might be instructive had the word "compensation" been used in the Agreement and been the word or phrase at issue in this case. However, "compensation" is not a word used in the Agreement to describe the Department's duty to reimburse PIBH.[7]

Next, the Department contends that because the Agreement does not use the words "bonus" or "severance," they are

---

**4.** This was subject to the annual maximum of $10,806,058, set forth in Agreement No. 720999. It is not claimed by the Department that PIBH exceeded the budget caps.

**5.** The Department asserts that "actual costs for work completed" is clear and unambiguous, and it means that an invoice that does not show that it relates to costs for work completed, it may be rejected. To concede the term is ambiguous would allow this court to construe the contract against the draftor. *Sabad v. Fessenden,* 825 A.2d 682 (Pa.Super.2003). The Department does not explain why, then, it offered Ms. Gross's testimony as parol evidence at the hearing before the Board to support its position that "actual costs for work completed" was limited to costs the Department deemed "normal."

**6.** In *Beardsley,* this Court had to determine a bonus payment was compensation under the Pennsylvania State Employees Retirement Code for purposes of calculating retirement benefits. Although the Department concedes that *Beardsley* is a statutory construction case, it urges this Court to use the four part test

adopted in *Beardsley* to determine whether a bonus is compensation. In relevant part, this Court stated:

> [A] one time payment was a bonus, and thus not included in the computation of compensation where: (1) the employer had no contractual obligation to pay the bonus; (2) the employer did not term the amount "wages"; (3) the employer retained unfettered discretion in deciding whether it would be paid; (4) there was no objective method of calculating how large the bonus would be; and (5) the bonus represented a relatively small fraction of the claimant's total income from his employment.

*Beardsley,* 691 A.2d 1016, 1020. The Department contends that because there is no evidence in the record to support the first four prongs, the bonuses cannot possibly be considered compensation.

**7.** Even so, PIBH offers compelling authority to support the proposition that compensation, or "wages," is a concept broad enough to encompass bonus and severance. *See infra.* p. 714.

not reimbursable. The Department reasons that because PIBH failed to specify a category for bonus and severance payments in the Budget, the Department cannot reimburse PIBH for these payments. We disagree for several reasons.

First, the Department's argument is founded on the premise that PIBH was required to inform the Department of the specifics of its compensation practices. However, no such obligation is stated in any of the operative documents that make up the Agreement of the parties. PIBH's Budget did not identify any of the components that made up the total annual projections for the cost of direct and indirect labor. Once PIBH presented its Budget, the duty was on the Department to demand more detail if it lacked the specificity expected by the Department. Instead, the Department accepted the Budget in the form submitted and made it part of the Agreement.

Second, the Department's argument is flawed by inconsistency. The words as "health insurance" do not appear in the Agreement, and yet the Department agreed to pay health insurance. It has singled out the bonus and severance components of labor "costs" for non-payment. The Department contends that there is a crucial difference between bonuses and pension, which the Department refused, and medical, life and disability insurance

payments, which the Department paid. The difference is that PIBH itemized these insurance and benefits in its invoices, and PIBH did not itemize bonus and severance from the "payroll." [8] This is not a compelling justification.

The Agreement requires PIBH to submit an itemized statement of its actual expenditures, but there is no basis for believing that the invoice was intended as the device to refine the meaning of "actual costs for work completed." Further, the objection is easily overcome: PIBH could simply revise its invoice form to specify bonus and severance payments.[9] PIBH was required only to invoice by Budget category, and that is exactly what it did.

■ The Department's alternate theory is that since bonus and severance payments were not addressed in the Agreement, there was no meeting of the minds on their payment.[10] A meeting of the minds requires the concurrence of both parties to an agreement, or they have failed to operate a enforceable contract. *Mountain Properties Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa.Super.2001). Further, there must be a meeting of the minds on all terms in a contract. *Onyx Oils Resins Inc. v. Moss*, 367 Pa. 416, 420, 80 A.2d 815, 817 (1951).

■ The Department's meeting of the minds argument is not persuasive.[11] The

---

**8.** At oral argument before the Court, the Department explained that it did not contend this was a failure of proof but a failure to attribute the costs to "work completed" during the contract. Upon further questioning, however, it could not explain why it reimbursed costs for employees' paid vacations as an "actual costs for work completed" but distinguished and disallowed costs attributed to accrued but unused vacation time.

**9.** Indeed, the invoice form could be the device for PIBH to abuse its rights under the Agreement. For example, PIBH could purchase a

home for a manager simply by itemizing that expense in the "indirect labor" invoice.

**10.** This is somewhat contradictory to the Department's claim that "actual costs for work completed" is clear and unambiguous.

**11.** Although Department frames its argument as a lack of meeting of the minds, it appears, instead, to argue mistake. In any case, a party's failure to anticipate all possible repercussions of a bargained for contract is insufficient to render a contract invalid. *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990)

Department agreed to pay PIBH for its "actual costs for work completed" up to the maximum budget cap of $4,213,684 for Direct Labor and $831,673 for Indirect Labor. There was a meeting of the minds on the Department's obligation to reimburse PIBH for its labor costs, and the Department does not contend that PIBH did not incur costs invoiced for bonus and severance payments.

■ As pointed out by PIBH, labor costs must be understood as a broad term. In support, it points out that Section 2.1 of the Pennsylvania Wage and Payment and Collection Law (WPCL), Act of July 14, 1961, P.L. 637, *as added by* the Act of July 14, 1977, P.L. 82, defines "wages" as follows:

> "Wages." Includes all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes *fringe benefits* or *wage supplements* whether payable by the employer from his funds or from amounts withheld from the employees' pay by employer.

43 P.S. § 260.2a (emphasis added). Both bonuses [12] and the payment of accrued but unused vacation pay fall within this definition of "wages." *See Gautney v. Amerigas Propane, Inc.,* 107 F.Supp.2d 634 (E.D.Pa. 2000) (bonuses owed under employment contracts are "wages" within the meaning of Pennsylvania WPCL); *Harding v. Duquesne Light Co.,* 882 F.Supp. 422 (W.D.Pa.1995) (accrued but unpaid vacation time and stock appreciation rights constitute "wages" under WPCL). This precedent supports the proposition that bonuses and payment for accrued but unused vacation pay are nothing unusual and are, in fact, valid labor costs.

The Department may regret that it did not contractually retain the right to supervise PIBH's compensation practices, but this does not support the conclusion that the parties failed to effect an enforceable contract or contract term. The Department could have demanded a more detailed Budget that would show each component of "direct labor" and "indirect labor" costs, but it did not. We are constrained to give meaning to the words used, and so we affirm the Board's construction of the Agreement.

(contracting parties are normally bound by their agreements, without regard to whether terms thereof were read and fully understood and irrespective of whether agreements embodied reasonable or good bargains). *See generally,* 12 P.L.E.2d *Contracts* §§ 82, 83, 84 (2001) (discussing Mistake, Signing in Ignorance of the Contents, and Mutual Mistake). Further, "[a] party bears the risk of a mistake when ... (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." RESTATEMENT (SECOND) CONTRACTS § 154 (1981). The Department tries to place the onus on PIBH for not informing Department of its intent to pay its employees bonus and severance payments. However, the Department failed to communicate to PIBH about its expectations for the components of "direct labor" and "indirect labor" costs. This is a unilateral mistake, and

because it was not caused by the opposing party, *i.e.,* PIBH, no relief is appropriate. *Welsh v. State Employees' Retirement Board,* 808 A.2d 261 (Pa.Cmwlth.2002) (unilateral mistake which is not caused by the fault of the opposing party affords no basis for relief).

The Department asserts no authority for its position that in the absence of a meeting of the minds, its construction of "actual costs for work completed" prevails. A meeting of minds is required in order for an enforceable contract to exist. It is not a principle of law that is invoked when the question is one of contract construction.

12. Notably, in the Specifications, PIBH was obligated to establish an "employee recognition and progressive discipline plan." R.R. 174a. A bonus is a time-honored means of recognizing service.

## THE AMENDED COMPLAINT

■ The Department next challenges the Board's decision to allow PIBH to amend its complaint to include all invoices rejected by the Department because they included bonus and severance payments in the category of direct and indirect labor costs. The Department argues that the statute of limitations in a contract claim begins to run when the cause of action accrues, and the applicable statute of limitations here was six months after the claim accrued. PIBH did not seek to amend its complaint until August 6, 2004, long after the six-month statute of limitations for initiating a contract claim against the Department had run on most of the invoices.

The premise to the Department's argument here is that each invoice denial constituted a separate cause of action. In support, it directs the Court to *American Motorists Insurance Co. v. Farmers Bank and Trust Company of Hanover*, 435 Pa.Super. 54, 644 A.2d 1232 (1994), where an insurer was permitted to amend its complaint to recover four years of alleged overpayments to a nursing home. It was limited to four years because that was the applicable statute of limitations for contract claims. In explaining its decision to impose a time limit to the amendment, the Superior Court observed that the plaintiff introduced a brand new legal theory, thereby changing its original cause of action. By contrast, PIBH has pursued the same legal theory since inception of this litigation.

■ The determination of whether to grant leave to amend a complaint lies within the sound discretion of the trial court; such leave should not be granted if it results in. surprise or prejudice to the other party or where the amendment is against a positive rule of law. *Bogert v. Allentown Housing Authority*, 426 Pa. 151, 157–58, 231 A.2d 147, 150 (1967). While amendments to pleadings are liberally granted in general,[13] an amendment which introduces a new cause of action, *i.e.*, new theory, will not be permitted after the statute of limitations of that cause of action has expired.[14] *Laursen v. General Hospital of Monroe County*, 494 Pa. 238, 243, 431 A.2d 237, 239 (1981). Where, however, the proposed amendment does not change the cause of action, but merely amplifies that which has already been averred, the amendment should be allowed. *Id.* An amendment states a new cause of action where the amendment rests on a different legal theory, basis for recovery or relationship between the parties. *American Motorists*, 644 A.2d at 1235.

PIBH's amendment did not introduce a new legal theory, as was the case in *American Motorists*. As found by the Board, the parties were the same; the legal theory was the same; the relationship was the same; the actions complained of were the same; and the contract sued upon was the same. There was no surprise or prejudice to the Department because there was no new cause of action presented. The Complaint, at paragraph 11, specifically

---

13. The purpose of this liberal policy is to give parties the full opportunity to plead their cause of action and not turn them out of court for technical errors, for it is always desirable to dispose of litigation on the merits when possible. *Laursen v. General Hospital of Monroe County*, 494 Pa. 238, 244, 431 A.2d 237, 240 (1981) (quoting *Arner v. Sokol*, 373 Pa. 587, 592, 96 A.2d 854, 856 (1953)).

14. Amendments adding new causes of action after the statutes of limitations have run are prejudicial to defendants because they subject them to claims without permitting them to raise the statute of limitations defense, which would otherwise be available to them. *Hodgen v. Summers*, 382 Pa.Super. 348, 555 A.2d 214, 216 (1989).

716

averred a continuing harm from the Department's refusal to reimburse its bonus and severance payments. The legal question was always the same: whether bonus and severance payments were valid costs for work completed.

 PIBH sued for breach of contract. When it filed its complaint, its total damages were unknown because the Agreement was still in force and would be for the next four years. The invoices included in the amended complaint were simply additional items of damages.[15] The Pennsylvania Superior Court has explained that an amendment of the *ad damnum* clause is permitted at any point in litigation. *R.P. Clarke Personnel, Inc. v. Commonwealth National Bank,* 384 Pa.Super. 524, 559 A.2d 560, 566 (1989). We agree with this principle and uphold the Board's grant of amendment.

## CONCLUSION

We are bound by the written words of the Agreement. The Department was painstakingly exacting on some aspects of the Agreement. Exhibit "B," the Specifications, set forth over 30 pages of detail on how the license centers would be operated. However, it left to PIBH discretion to determine its compensation practices. As a consequence, the Budget is not a detailed document. It identified fourteen categories of expense, plus burden, and each PIBH invoice tracked each category in the Budget. Ordinary contract principles require that where a party is granted discretion under the terms of the contract, the discretion must be exercised reasonably, subject to the implied duty of good faith and fair dealing. RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). By following its long-standing compensation practices,

PIBH did exercise its discretion reasonably.

Accordingly, the decision of the Board is affirmed.

## ORDER

AND NOW, this 26th day of October, 2005, the order of the Pennsylvania Board of Claims dated April 15, 2005, in the above-captioned case is hereby affirmed.

---

**15.** The Department's position would clog the Board's filing office for no good reason.